IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| MOHAMMAD NAZIR SAHEED, *pro se*, <br><br> Plaintiff, <br><br> v. <br><br> HUNTINGTON INGALLS INDUSTRIES, INC., <br><br> Defendant. | Case No. 4:23-cv-123 |

**OPINION & ORDER**

Defendant Huntington Ingalls Industries, Inc. ("HII") seeks summary judgment of the claims filed against it under Title VII of the Civil Rights Act of 1964 (Title VII) by Plaintiff Mohammad Nazir Saheed, appearing *pro se*. ECF No. 51. Because the plaintiff fails to establish a prima facie case as to either of his claims, HII's motion will be **GRANTED**.

**I.    BACKGROUND**

    **A.    Factual Background**

The following undisputed facts are sufficient to enable the Court to decide the summary judgment motion:

1. Saheed is a browned-skinned Muslim who was born in Afghanistan. ECF Nos. 18 ¶ 45; 52 at 1.

2. Saheed began working for HII in February 2019 when HII acquired another company, Fulcrum. ECF No. 52-1 at 1 ¶ 2.

3. Saheed was assigned to a team of intelligence analysts called "I-CAT." ECF No. 52-1 at 1 ¶ 2.

4. In 2021 and 2022, CACI was the prime contractor on a contract with the federal government and HII sub-contracted a portion of CACI's work. ECF No. 52 at 5 ¶ 8. Saheed provided intelligence notes to the government as part of HII's sub-contract with CACI. *Id.*

5. In 2021, Saheed's direct supervisor who oversaw his day-to-day work was Bartley Martindale. ECF No. 52-1 at 1 ¶ 3. For the first part of 2021, the I-CAT team lead was Omar Chiguer, but in September 2021, Michael Deal became the I-CAT team lead. *Id.* Scott Howard was the program manager overseeing the I-CAT team. ECF No. 52 at 5 ¶ 6.

6. When Chiguer was team lead, he attempted to help Saheed with his performance but Saheed "accused [] Chiguer of micromanaging his work and refused to show [] Chiguer his work or collaborate on any projects." ECF No. 52-1 at 1 ¶ 5. Chiguer had to correct incomplete work Saheed had provided to the customer. *Id.*

7. I-CAT team analysts worked from home due to COVID-19 during most of 2021, but in the fall, analysts began returning to in person work. ECF No. 52 at 4 ¶ 5. While working from home, the I-CAT team worked under specific protocols that restricted the use of unclassified networks for conducting research or analysis related to classified information. ECF Nos. 54 at 3; 65 at 4.

8. Saheed briefly returned to work in person in November 2021 but underwent a medical procedure that required him to work from home again until January 2022. ECF No. 52 at 4 ¶ 5.

9. On December 16, 2021, Deal sent an email to Howard suggesting Saheed be placed on a performance improvement plan (PIP). ECF No. 62-2 at 2.

10. On April 21, 2022, Deal issued Saheed a PIP, which was created based on feedback from Martindale, Howard, Chiguer, CACI, and the government customer. ECF Nos. 52 at 6 ¶¶ 10–11; 52-1 at 1 ¶ 4.

11. In response to the PIP, on April 25, 2022, Saheed sent an email to Deal and several human resources (HR) employees documenting his complaints about Deal. ECF No. 62-4 at 2–4.

12. Mike Ortwein, a manager with I-CAT, and Deal informed HR that Saheed made "little or no effort" to correct or improve his performance despite training from Martindale, Deal, and Howard. ECF No. 52-1 at 2 ¶ 8.

13. On multiple occasions in 2022, CACI and the government customer requested that Saheed be removed from the contract. ECF Nos. 52-1 at 2 ¶ 13; 52-3 at 1 ¶¶ 4, 7.

14. Ortwein approved Saheed's termination on September 29, 2022, and Todd Gentry, a senior vice president at HII, gave a final approval of the termination on September 30, 2022. ECF Nos. 52-1 at 2 ¶ 14; 52-3 at 1 ¶ 3.

15. HII terminated Saheed on October 13, 2022. ECF No. 18 at 9 ¶ 47.

16. HII did not replace Saheed's position. ECF No. 52-4 at 1 ¶ 4. Instead, CACI elected to use one of their own employees. *Id.*

### B. Procedural History

HII filed a motion for summary judgment on August 19, 2025, ECF Nos. 51 (motion), 52 (memorandum), which Saheed initially opposed on August 27, 2025, ECF No. 54. The Court deferred ruling on summary judgment until Saheed's pending discovery motions were complete. ECF No. 57.

On September 29, 2025, the Honorable Douglas E. Miller granted in part and denied in part Saheed's motions to compel discovery (ECF Nos. 43, 45) and denied Saheed's motion for issuance of a subpoena (ECF No. 44). ECF No. 58. Judge Miller also ordered Saheed to file any additional summary judgment response to the extent one was needed by November 3, 2025. *Id.* at 1–2 ¶ 3. On November 10, 2025, Saheed filed two identical oppositions to summary judgment, ECF Nos. 62, 63, and on November 17, he filed two identical supplemental oppositions, which include a motion for sanctions,[1] ECF Nos. 65, 66. On December 9, Saheed filed a letter requesting clarification of the record and requesting fair consideration in support of his opposition to summary judgment. ECF No. 69.

Saheed's November 10 and 17 briefing and his December 9 letter are all untimely pursuant to Judge Miller's order that Saheed file any additional summary

---

[1] Judge Miller denied Saheed's motion for sanctions on December 11, 2025. ECF No. 70.

4

judgment response by November 3. However, in deference to Saheed's *pro se* status, the Court will consider Saheed's untimely filings, including the exhibits attached.

## II. LEGAL STANDARDS

### A. Summary Judgment

A court may "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Med. Mut. Ins. Co. of N. Carolina v. Gnik*, 93 F.4th 192, 200 (4th Cir. 2024); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To do that, the movant must support their assertions as to undisputed facts by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

If the moving party is successful in the first instance, then the burden "shifts to the non-movant to 'set forth specific facts showing that there is a genuine issue for trial.'" *Gnik*, 93 F.4th at 200 (quoting Fed. R. Civ. P. 56(e)). "The facts and all justifiable inferences arising therefrom must be viewed in the light most favorable to

the non-movant." *Gnik*, 93 F.4th at 200 (citation omitted). However, if the non-movant "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or may "grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

### B. Title VII

A plaintiff may establish liability for a Title VII claim by either: (1) direct evidence or (2) relying on the burden shifting scheme set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 254–55 (4th Cir. 2025). "To prevail under the *McDonnell Douglas* framework, [the plaintiff] must first establish a prima facie case." *Foster v. U. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

The elements of a prima facie case of discriminatory firing are: "(1) that [the plaintiff] is a member of a protected class; (2) that [they] suffered from an adverse employment action; (3) that [they were] performing at a level that met [their] employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 219 (4th Cir. 2016) (quoting *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003)). The elements of a prima facie case of retaliation are: "(i) that [the plaintiff] engaged in protected activity, (ii) that [their] employer took adverse action

against [them], and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." *Guessous*, 828 F.3d at 217.

Once the plaintiff has established a prima facie case on a Title VII claim, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster*, 787 F.3d at 250. "If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

## III. ANALYSIS

### A. Judicial Estoppel[2]

HII argues that Saheed's claims should be judicially estopped because of his inconsistent statements in his workers' compensation claim about his ability to work. ECF No. 52 at 25–27. Saheed filed a workers' compensation claim against HII for injuries arising out of his employment with HII. ECF No. 52-6 at 3 ¶ 1. In interrogatory answers connected with the workers' compensation claim, Saheed represented that he had a "temporary total disability" from July 15–23, 2021, and October 13, 2021, until at least September 27, 2023. ECF No. 52-5 at 5. He

---

[2] Saheed does not respond to HII's argument regarding judicial estoppel. However, in deference to his *pro se* status, the Court will not consider the argument waived.

7

represented that he was "taken out of work" from July 15–23, 2021, but released back to office work thereafter. *Id.* at 7.

In Saheed's petition to the Virginia Workers' Compensation Commission in April 2025, Saheed represented that he "has now recovered from his injury to the extent that he believes he is capable of performing a number of available jobs." ECF No. 52-6 at 4 ¶ 7. The workers' compensation settlement order, awarding Saheed $110,000, calculates his life expectancy as 1,523.6 weeks and his weekly compensation rate from his settlement as "$56.88 per week," for a total of $86,660.22. ECF No. 52-6 at 8, 9 ¶ 2.

HII contends that by claiming he had a "temporary total disability" from 2021 to 2023, Saheed represented that he was unable to work at all during that period, and his settlement (approved by the Virginia Workers' Compensation Commission) was in part based on this representation. ECF No. 52 at 25–27. But Saheed's interrogatory answers clearly state that he was released back to work after July 23, 2021, ECF No. 52-5 at 7, and it is unclear whether the settlement agreement was based on any representation of Saheed's ability to work during any specific period of time, ECF No. 52-6 at 9. The order merely calculates Saheed's life expectancy and provides his weekly compensation rate, *id.*, which is not enough for the Court to conclude that the settlement was based on Saheed's representation that he could not work at all from October 13, 2021, as HII claims. Therefore, Saheed's Title VII claims are not judicially estopped by his workers' compensation claim.

## B. Discovery Issues

Federal Rule of Civil Procedure 56(d) allows a court to "defer ruling on a summary [] judgment motion until the nonmovant has had a reasonable opportunity to discover information that is essential to its response." *Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 250 (4th Cir. 2018).

Saheed argues that HII's summary judgment motion should be denied because HII has not provided him with "critical" discovery. ECF Nos. 54 at 2; 62 at 3, 5; 65 at 3; 69 at 2–3. However, Judge Miller previously considered Saheed's motions to compel discovery, ECF Nos. 43, 45, and granted those motions only as to one limited category—requiring HII "to make a more fulsome response to the interrogatory directed to Mr. Deal's appointment as acting team lead" and to produce "a short e-mail production . . . of e-mail between or among Mike Deal, Scott Howard and [Todd Gentry] . . . which refers or relates to Mr. Saheed." ECF No. 60 at 31:5–10, 32:7–13. As to all other categories of discovery, Judge Miller held that Saheed's motions to compel were a "fishing expedition," particularly given Saheed has had two years to investigate his claims. ECF No. 60 at 34:10–12. Thereafter, Saheed has continued to file motions for sanctions for alleged discovery shortcomings, ECF Nos. 62, 63, 66, which Judge Miller has denied as frivolous, ECF No. 70.

Saheed provides no new argument in his summary judgment briefing that could lead this Court to conclude that he has not had a "reasonable opportunity to discover information that is essential." Thus, the Court will not defer ruling on summary judgment based on any alleged discovery shortcoming.

### C. Discriminatory Firing Claim

Because Saheed has provided no direct evidence of discriminatory firing, the Court will examine Saheed's claim under the *McDonnell Douglas* framework.

HII does not dispute that Saheed suffered from an adverse employment action—he was fired in October 2022—nor that he is a member of a protected class—he is a brown-skinned Muslim from Afghanistan. ECF Nos. 18 at 2, 9; 52 at 13. But HII does dispute whether Saheed was performing his job satisfactorily and whether the position was filled by a similarly qualified applicant outside the protected class. ECF No. 52 at 13–19. For the reasons stated below, Saheed fails to make a prima facie case of discriminatory firing, and even if he had made such a showing, the undisputed evidence shows that his firing was not pretext.

#### i. *Prima Facie Case: Job Performance*

Saheed asserts that he performed his job well and from 2018 consistently received a "satisfying annual review." ECF No. 54 at 4. He also states that Howard told him in December 2021 that he was doing "absolutely great." *Id.* Therefore, he claims that any alleged underperformance was only due to the COVID-19 telework restrictions that prohibited analysts from conducting mission analysis from home on unclassified networks. *Id.* at 3–4. He also argues that his performance was "artificially depressed" because Deal "intentionally withheld assignments" from him. *Id.* at 4.

Saheed points to three pieces of evidence in support of his arguments: (1) two October 2021 emails listing other employees who were out of compliance with

timecard entries, ECF No. 62-1; (2) a December 2021 email from Deal to Howard recommending a PIP for Saheed, where Howard responds, "[c]an you call me when you get a free moment?" ECF No. 62-2 at 2; and (3) an April 2022 email chain where Deal informs HR that he presented the PIP to Saheed and HR responds that they will need to re-issue with PIP to him again with HR present, ECF No. 62-3 at 2.

      None of Saheed's proffered evidence provides any support for his proposition that he was performing his job satisfactorily. First, a plaintiff's own statements "cannot establish a genuine issue as to whether [he] was meeting [the employer's] expectations." *King*, 328 F.3d at 149. So the Court cannot credit Saheed's own statements about his allegedly satisfying job performance. But even assuming the Court could credit Saheed's own statements, none of the evidence he provides shows whether he was performing well in October 2022, when he was fired. *Diamond v. Bea Maurer, Inc.*, 128 Fed. App'x 968, 973 (4th Cir. 2005) (unpublished) ("[A]cceptable job performance in the past does not establish acceptable job performance at the time of the termination."); *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 547 (4th Cir. 1995), *rev'd on other grounds*, 517 U.S. 308 (1996) (holding that a positive review eight months earlier was not relevant to determining whether the employee was performing satisfactorily at the time of termination).

      Whether other employees were out of compliance with their timecard entries in October 2021 is entirely irrelevant to the question of whether Saheed was adequately performing his job—including whether he was complying with timecard entries—in October 2022, a full year later. Additionally, Saheed argues that any

11

potential performance inadequacies were due to Deal intentionally withholding assignments from him, but Saheed has not provided any evidence, other than pure conjecture of such action. Saheed argues that the two emails Saheed provides regarding Deal recommending and presenting Saheed with a PIP show that Howard "rejected" Deal's "initial PIP attempt, confirming it was unwarranted" and that "HR's own manager questioned Deal's unauthorized actions." ECF No. 62 at 4. But the emails do nothing of the sort. Howard asking Deal to call him in response to Deal recommending a PIP for Saheed does not merit any inferences because the subject of the call is unknown. Thus, the inference Saheed asks the Court to draw from this evidence is simply not supported by the facts. And Deal's April 2022 email with HR in fact undercuts Saheed's argument that he was performing well because it shows that HR was on board with issuing Saheed a PIP.

Therefore, Saheed fails to establish that he was "performing at a level that met [HII's] legitimate expectations" and so fails to establish a prima facie case of discriminatory firing under Title VII.

## ii. *Prima Facie Case: Similarly Situated Employees*

Saheed also fails to show that his previous position was filled by a similarly qualified applicant outside his protected class.

Saheed testified during his deposition that two of his former team members told him he had been replaced by someone who was not from the Middle East. ECF No. 52 at 16; ECF No. 52-2 at 159:5–161:8. But Saheed provides no evidence on which the Court can credibly rely—beyond his say so—regarding his two former team

members' purported statements nor any other evidence of his position being filled. Furthermore, the program control analyst overseeing Saheed's former team reviewed employment records from 2022 and 2023 and confirmed that Saheed was not replaced. ECF No. 52-4 at 1 at ¶ 4 ("[M]y notes indicate that 'CACI took backfill' which means CACI, the prime contractor, elected to use one of their own employees, rather than one of [HII's] employees, on the contract."). Therefore, Saheed fails to raise a genuine dispute as to whether he was replaced by a similarly qualified applicant outside his protected class.

### iii. *Employer's Legitimate Reason*

Even if Saheed had established a prima facie case of discriminatory firing, the Court would still conclude that HII has provided a legitimate reason—his underperformance—that Saheed was fired and that Saheed failed to establish this reason was pretextual.

Catherine Miciano-Mayo, an HII HR manager, testified that Saheed's PIP was compiled based on feedback from multiple parties: Deal, Martindale (who oversaw Saheed on a day-to-day basis), Howard, Chiguer, and the customer. ECF No. 52-1 at 1 ¶ 4. Miciano-Mayo stated that Chiguer had previously "attempted to help [] Saheed with his performance, but [] Saheed accused [] Chiguer of micromanaging his work and refused to show [] Chiguer his work or collaborate on any projects. [] Chiguer had to correct incomplete work [] Saheed had provided to the customer." *Id.* at ¶ 5. Additionally, Miciano-Mayo testified that after Saheed was issued the PIP, Ortwein and Deal informed HR that Saheed "made little to no effort to correct or improve his

13

performance while on the PIP" and made "no improvement despite training from" Martindale, Deal, and Howard. *Id.* at 2 ¶ 8. Martindale provided work samples to Saheed, but Saheed "did not think his work needed to be corrected." *Id.* And Deal provided "side-by side assistance" to Saheed. *Id.* Finally, Miciano-Mayo testified that on multiple occasions, the customer requested that Saheed be removed from the contract. ECF No. 52-1 at 2 ¶ 13.

Furthermore, Gentry, who approved the decision to terminate Saheed's employment, testified that his decision was due to Saheed's timesheet issues, poor intelligence notes, and "[m]ost importantly," because the customer no longer wanted Saheed on their projects after consistently receiving sub-par work. ECF No. 52-3 at 1 ¶¶ 5–7.

HII has provided sufficient evidence to show that its decision to terminate Saheed was based on legitimate issues with his performance and requests from the customer to remove Saheed from their project. *See Arthur v. Pet Dairy*, 593 Fed. App'x 211, 217 (4th Cir. 2015) (unpublished) (finding that the appellant "failed to create a genuine dispute about whether he satisfied the legitimate expectations of his employer at the time of termination" in part because his performance had "generated numerous customer complaints . . . before he was terminated"). And Saheed does not provide any evidence that such reasons were pretextual.

Saheed argues, without any support, that the PIP and low performance evaluations were an "orchestrated scheme" designed to create pretext to fire him and that HII has "shifted its story" regarding the reasons he was fired. ECF No. 54 at 3,

14

5. However, Saheed does not provide any evidence of such a "scheme" or alleged changing stories beyond speculation and so his arguments do not establish pretext. *See Demuren v. Old Dominion Univ.*, 33 F. Supp. 2d 469, 479 (E.D. Va. 1999) ("[A] plaintiff must do more th[a]n simply challenge the truthfulness of the defendant's explanation. Rather, he must offer some evidence that discrimination was the defendant's actual motivation."); *El-Hage v. Levitt*, No. 2006-cv-1650, 2007 WL 9782573, at *7 (D. Md. Sept. 19, 2007) ("Plaintiff's speculation that [d]efendant's alleged justification must be a pretext is not sufficient evidence to sustain a claim under Title VII.").[3]

Additionally, Saheed argues that other employees were out of compliance with their timecard entries which demonstrates "selective punishment and pretext." ECF No. 62 at 1. However, Saheed's only proffered evidence for this point are two emails from October 2021 listing team members who were out of compliance, ECF No. 62-1, which does not help the Court determine whether other employees were having similar performance issues to Saheed, including timecard issues around October 2022, when Saheed was fired, or even April 2022, when he was issued a PIP. Furthermore, Saheed himself testified that all of the other intelligence analysts on his team, several of whom shared a similar national origin, skin color, and/or religion,

---

[3] Saheed also asserts, without any evidentiary support in the record, that Deal told him during a December 2021 phone call, "I don't know why people like you are even here" and "someone needs to leave that team and that's you." ECF No. 18 ¶¶ 24–25. But without evidence of this purported statement beyond his say so and without a causal connection linking this statement to HII's adverse employment action a year later, Saheed has failed to demonstrate that this statement alone raises a genuine dispute as to whether HII's stated reasons for firing him were pretextual.

15

received "normal" performance reviews and that he was the only one who received a "negative" performance review. ECF No. 52-2 at 50:15–51:23, 52:16–53:2, 88:14–15, 105:13–14. Therefore, even assuming the single October 2021 email regarding timecard issues showed that Saheed was not the only one out of compliance with his timecard between April and October 2022, Saheed has provided no evidence that other employees had other similar performance issues as he did. In fact, based on Saheed's testimony about other I-CAT team members' "normal" reviews, it appears that they did not.

Finally, the emails Saheed provides regarding Deal's alleged discriminatory bias also do not demonstrate pretext. *See* ECF Nos. 62-2, 62-3, 62-5. Saheed argues that December 2021 emails between Deal and Howard and April 2022 emails between Deal and HII's HR demonstrate a "lack of legitimate basis" for the PIP and "punitive intent" by Deal. ECF No. 62 at 1. However, as explained above, *supra* Part III.C.i, such emails only show that HR was on board with the PIP and do not show anything about Howard's opinion of the PIP.

Saheed does not provide any evidence that HII's underlying reasons for issuing the PIP and for ultimately firing him were for anything other than legitimate non-discriminatory purposes. In short, Saheed fails to show pretext.

### D. Retaliation Claim

Saheed similarly fails to establish a prima facie case of retaliation.[4] The undisputed evidence shows that Saheed was fired due to performance issues and

---

[4] Saheed also does not provide direct evidence in support of his retaliation claim.

refusal to comply with the PIP, not his April 2022 email. There is no evidence in the record that Saheed's complaint played *any* role in his firing.

"To establish a causal relationship between the protected activity and the termination, a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021). Gentry, who testified that he approved the decision to terminate Saheed in September 2022, did so without any knowledge of Saheed's complaint and without knowledge of his national origin, skin color, or religious affiliation.[5] ECF No. 52-3 at 1. Saheed argues that Deal "played a determinative role in setting the stage for termination" but he provides no evidence of this beyond his mere say so. ECF No. 54 at 4.

Instead, the undisputed evidence shows: (1) an August 12, 2022 email from Deal recommending to Ricky Akiona (an HII HR employee) that Saheed be terminated, ECF No. 62-6 at 5; (2) an August 18, 2022 email response from Akiona to Deal asking for specific information that "will help us with [l]egal to make the case stronger for termination," ECF No. 62-6 at 7–8; (3) an August 19, 2022 email from Deal sending an "independent evaluation of several corrective actions related to [Saheed's] performance" from Martindale to the customer and requesting "any additional feedback" Deal could send to HR, ECF No. 62-6 at 2; (4) September 2022 emails between Deal and Akiona where Deal checks in on the status of Saheed's PIP

---

[5] Saheed states that Gentry "interviewed" him over Zoom. ECF No. 54 at 4. But Saheed does not provide any timeframe or details about this alleged interview, and the Court cannot credit Saheed's self-serving claim. *King*, 328 F.3d at 149.

17

and Akiona responds, "I talked with [Miciano-Mayo] and we will just go to process his termination," but he is "waiting for [Howard] to approve of the termination" and "may also have to get [Ortwein's] approval as well," ECF No. 62-6 at 13–14; (5) testimony from Miciano-Mayo documenting the feedback she received from Ortwein and Deal that Saheed "made little to no effort" to comply with the PIP, despite Martindale and Deal's attempts to assist him, ECF No. 52-1 at 2 ¶ 8; (6) testimony from Gentry stating that he approved the decision to terminate Saheed's employment due to performance issues and because the customer no longer wanted Saheed on their projects due to his inadequate performance, ECF No. 52-3 at 1 ¶¶ 5–7; (7) testimony from Miciano-Mayo that both Ortwein and Gentry approved Saheed's termination, ECF No. 52-1 at 2 ¶ 14.

The evidence shows that HR made the decision to terminate Saheed—not Deal—and that decision was approved by Howard, Ortwein, and Gentry. While Deal appeared to certainly advocate for Saheed's termination, there is no evidence that such advocacy was based on Saheed's April 2022 email. Instead, the evidence shows that HR's recommendation to fire Saheed was based on input and feedback from multiple parties, including at least Martindale and the customer, and that Gentry was the ultimate decision-maker.

Therefore, Saheed fails to show "a causal relationship existed between the protected activity and the adverse employment activity" such that he could establish a prima facie case of retaliation. *Guessous*, 828 F.3d at 217.[6]

## IV.  CONCLUSION

For the reasons stated herein, Defendant Huntington Ingalls Industries, Inc.'s motion for summary judgment (ECF No. 51) is **GRANTED.**

The Clerk's Office is **DIRECTED** to enter judgment in favor of the Defendant Huntington Ingalls Industries, Inc.

The Clerk's Office is **FURTHER DIRECTED** to send a copy of this Opinion and Order to the plaintiff.

**IT IS SO ORDERED**.

/s/
Jamar K. Walker
United States District Judge

Newport News, Virginia
January 27, 2026

---

[6] Even if Saheed could make out a prima facie case, this claim would fail at steps two and three of *McDonnell Douglas* framework. *See supra* Part III.C.iii.